IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

| | |
|---|---|
| EVERSEEN LIMITED, | |
| Plaintiff, | **PUBLIC REDACTED VERSION** |
| v. | JURY TRIAL DEMANDED |
| WALMART INC. f/k/a WAL-MART STORES, INC., | ████████████████ |
| Defendant. | 4:12-cv-04009-SOH |

**COMPLAINT**

Plaintiff Everseen Limited ("Plaintiff" or "Everseen") files this Complaint against

Defendant Walmart Inc. ("Defendant" or "Walmart"), formerly known and doing business as

Wal-Mart Stores, Inc., based on its knowledge, information, and belief about its own actions and

Walmart's actions as follows:

**I.    SUMMARY**

1.    Billions of dollars of retail merchandise are lost every year due to innocent

scanning errors and deliberate theft at registers (also known as "shrinkage").  Recognizing the

magnitude of this problem, Walmart worked for years ████████████████████████ trying

to develop technology to mitigate these losses.  It failed.

2.    Everseen, on the other hand, is a pioneer in this field.  By 2014, Everseen had

developed Checkout Process Intelligence ("CPI") technology to help cut down on loss resulting

from Point-of-Sale ("POS") scanning errors and theft.  Everseen's CPI technology leverages

artificial intelligence and deep neural networks to analyze shoppers' checkout experience and

identify (and alert the store) in real time when a scanning error or apparent attempted theft has

occurred.  Everseen has customers across the world implementing its technology.  In 2020, Everseen's worldwide revenues from customers deploying its CPI technology ███████████ ████████████████

3.      Everseen's technology improves the shopper experience at Self Checkout ("SCO") registers and prevents hundreds of thousands of dollars in loss from shrinkage at each store annually, enabling its customers to transition away from traditional, manned registers and unlocking a staggering return on investment.  Everseen's technology reduces customer friction when compared to traditional SCOs using scales, which are notoriously error prone, causing customer inconvenience and delay.  Everseen's technology also addresses the other main barrier to transitioning to SCO registers:  the higher loss from shrinkage at SCO registers (between 3 and 7 percent of all SCO transactions involve some degree of fraudulent activity, and fraudulent SCO transactions tend to involve high-value items).  Everseen's technology targets those transactions, saving its retail customers an average of over $4,000 per week at each store at which it is implemented (for stores with 20 SCO aisles).  The significant savings Everseen's technology achieves quickly dwarf the cost of implementation, and translate to a very strong return on investment for Everseen's customers.  They also help finance further infrastructure improvements, allowing Everseen's customers to leverage AI in other areas of the store, beyond the checkout area.  Everseen's technology helps retailers meet the emerging need to provide a contactless shopping experience.

4.      Everseen continually evolves its technology, employing game theory and nudge theory to stay one step ahead of the problem.  Realizing that bad actors will change their behavior based on the security measures in place, each generation of Everseen's technology is equipped to identify more loss-creating customer behaviors and schemes than the previous

generation.  Everseen is currently offering the fourth generation of its CPI technology, and has greatly expanded the categories of customer behavior it identifies to prevent loss.

5.      Everseen has been broadly recognized as a market leader.  The market, according to industry estimates, is expected to grow to $275 billion over the next four years.  Everseen topped the Deloitte 2020 Fast 50 Technology Awards, achieving a growth rate of 2,879% over the previous four years.  Everseen was also awarded Ireland's Innovative New Technology Award by Google and Deloitte, an award that highlights the development of innovative products and services for international markets.  Gartner's Hyper Cycle for Retail Technologies recognized Everseen four years in a row, recognizing it in 2020 in three categories:  Retail, Computer Vision, and Smart Check-Out.

6.      Having failed to develop its own technology to combat the significant financial impact of shrinkage, Walmart turned to Everseen.  ██████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████

7.      Between 2015 and 2020, Everseen installed the first three generations of its CPI technology in ████████ Walmart stores (Walmart ████████████████ before Everseen installed the most recent generation of its technology at Walmart stores).  Over that time, Everseen's CPI technology identified and prevented ████████████ of dollars a year of loss from shrinkage.

8.      Over the course of the parties' multi-year relationship, ████████████████████
████████████████████, Everseen explained to Walmart how its technology worked.

3

███████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████

████████████████████████████. Everseen's reliance on

Walmart to ████████████████████ refrain from misusing Everseen's technology turns

out to have been misplaced.

9.      Walmart grew unhappy with its increasing reliance on Everseen's technology and

began to look for an alternative. ████████████████████████████

██████████████████████████████████████████████

██

10.     ███████████████████████████████

██████████████████████████████████████

██████████████████████████████████

██████████████████.

11.     ████████████████████████████████

██████████████████████████████████████████

█████████████. Walmart used Everseen's trade secrets and confidential information to

develop what is essentially a Walmart copy of Everseen's CPI technology (the "Walmart

Derivative Technology").

12.     Once it started using Everseen's technology as a guide, it took Walmart an

unrealistically short period of time to get the Walmart Derivative Technology ready ████████

█████.

13.     ████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████ .

14.   ███████████████████████████████████████████

███████████████████████████████████ . Walmart did

not claim that Everseen had failed to perform adequately under the contracts or provide any

reason for ██████████████████████ . The reason is now clear:  Walmart is ████████████

█ replacing Everseen's technology with the Walmart Derivative Technology.

15.   Walmart also has begun to offer the Walmart Derivative Technology to other

retailers around the world and has begun competing with Everseen for business using technology

it developed by misappropriating and misusing Everseen's trade secrets and confidential

information.

16.   ██████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████ .

17.   ██████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████

18.   Everseen also has learned that Walmart used the information and trade secrets

5

Everseen provided in confidence, and ████████████████████████, to develop

the Walmart Derivative Technology ███████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████.

     19.     Walmart was able to develop and implement the Walmart Derivative Technology

at a pace that can only be explained by unlawful misappropriation and misuse of Everseen's

information and trade secrets. ██████████████████████████████████

██████████████████: without its ill-gotten Walmart Derivative Technology in place,

Walmart would have had to continue using Everseen's CPI technology to avoid the hundreds of

millions of dollars of shrinkage that technology prevented.

     20.     While Walmart's conduct may have saved it ███████████████████

███████, it imposed, and continues to impose, a much more devastating impact on Everseen.

     21.     Before Walmart stole its technology, Everseen was in position to win many of the

major retail contracts for which it was competing around the world.  Everseen had an

unparalleled solution that identified and prevented many types of events that lead to shrinkage,

and it had the world's largest retailer, Walmart, as a customer.  It was growing quickly and was

in prime position to dominate a market that will soon be worth hundreds of billions of dollars a

year.

     22.     ███████████████████████████████████████

████████████████████████████████████████████████

███████.

23.     Worse yet, Walmart is now competing with Everseen.  Walmart is trying to get other retailers to pay for and implement the Walmart Derivative Technology instead of the original Everseen CPI technology.

24.     ███████████████████████████████████████████████ ███████████████████████████ .

25.     The impact of Walmart's conduct, both in terms of ███████████████████████ ██████ and competing against Everseen with Everseen's own technology, will be devastating to Everseen if left unchecked.  The market for AI-assisted checkout process technology is in its nascent stages.  By taking Everseen's technology for its own competitive product, and by ███████████████████████████████████████████████████████████ ██████████████ , Walmart is jeopardizing Everseen's position as the market leader in an emerging market worth hundreds of billions of dollars a year.

26.     Everseen brings this lawsuit to protect its trade secrets, confidential information, and other intellectual property, and to enforce its contractual rights.

## II.   PARTIES

27.     Plaintiff Everseen Limited ("Everseen" or "Plaintiff") is an Irish company, having its registered office and principal place of business at 4th Floor, The Atrium, Blackpool Retail Park, Cork, Ireland T23 T2VY.

28.     Everseen is an industry-leading provider of technology for checkout intelligence and supply chain management.  Everseen's CPI technology helps its customers prevent loss from scanning errors and theft that occurs at both staffed and self-checkout cash registers.  Everseen has also developed logistic and supply chain solutions that leverage artificial intelligence.

29.     Defendant Walmart Inc. ("Walmart" or "Defendant"), previously known as Wal-Mart Stores, Inc., is a Delaware corporation having a principal of business at 805 Moberly Lane,

Bentonville, Arkansas 72716, U.S.A.

30.     Walmart is the world's largest retailer, with over 11,000 stores worldwide and over 4,500 stores across the fifty states and Puerto Rico.

## III.    JURISDICTION AND VENUE

31.     This is an action arising under, *inter alia*, federal copyright law, 17 U.S.C. § 501 *et seq.* and the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*.  The Court thus has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

32.     Everseen is a foreign company and Walmart is a Delaware Corporation with a principal place of business in Arkansas.  The amount in controversy is in excess of $75,000.  The Court thus has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

33.     The Court has personal jurisdiction over the parties.

34.     A substantial portion of the acts giving rise to this action occurred in this district, and Defendant Walmart resides in this district by virtue of its operation of stores, distribution centers, and offices (including its headquarters) in this district. ██████████████████ ████████████████████████████████████████████████.

Thus, venue is proper in this Court pursuant to 28 U.S.C. § 1391.

35.     ██████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████ █████████████████████████████████████████ █████████████████████████████████████ █████████████████████████████████████████ ██████████████████████.

## IV.    GENERAL ALLEGATIONS

### A.    Everseen's Confidential and Trade Secret CPI Technology

36.    In around 2010, Alan O'Herlihy ("O'Herlihy"), Everseen's Chief Executive Officer, began developing a partially automated system that used machine learning and video cameras at retail Points of Sale ("POS") to help detect and timely notify stores of potential scanning errors and theft at both self-checkout ("SCO") and manned checkout lanes.

37.    At the time, other companies that were trying to solve the problem of retail shrinkage focused on a broad array of customer behaviors.  For example, these companies would monitor shoppers as they walked through the aisles, as they entered the store, as they checked out, and as they left, for the purpose of identifying incidents of theft or error leading to shrinkage.  Those companies depended heavily on streaming video footage to human observers, often at remote locations, who would attempt to alert the store when a loss event (for example shoplifting) occurred.  This approach had several drawbacks, including (but not limited to):  the inconsistency in results across multiple remote observers; the inconsistency in results from single remote observers (including due to fatigue and human fallibility); the cost of human observers; limited scalability; and the inability to provide alerts in time for employees in the store to take any responsive action before the incident results in loss.

38.    Recognizing these limitations, Everseen departed from the standard approach in at least two important respects: ██████████████████████████████ ██████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ██████████████████████████████████.  Initially, the system identified

transactions in which a customer or employee moved a product across the scanner, but no scan was recorded by the POS register (a "non-scan" event). Later, Everseen would add additional areas of focus that would further refine and improve the accuracy of its system.

39.     From 2014 to 2016, Everseen continued to improve its system and to program the machine learning aspect to identify non-scan events based on data from video cameras positioned above POS registers (both manned and SCO registers). This was an iterative process that involved the repeated identification of many successive hurdles and challenges, which Everseen would overcome based on its cumulative experience and insights. This work included, but was not limited to: ███████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████.

40.     For SCO registers, Everseen also developed a way for the system to send an alert when a non-scan event had occurred (so a store employee could offer the customer the opportunity to re-scan and purchase the item in question). For this to work, Everseen needed to develop a system that could operate in real time, which presented significant computing and processing challenges ████████████████████████████████

████████████████████████.

41.     For manned registers, Everseen had to synchronize (from a timing perspective) the data from the POS register with the camera feed and the system's insights based on the video camera feed. This was difficult because the timestamping on the POS data would often shift, at random intervals, throughout the day.

42.     Following years of work, Everseen had developed a cutting-edge solution to these problems that could not easily be replicated by others.  As a result, Everseen has become a global leader in loss-prevention at the checkout lane.

43.     The following sections provide a brief, chronological overview of how Everseen's technology, as it relates to the claims in this complaint, was developed over time and how its solution works.  Everseen developed the world's leading model for leveraging artificial intelligence ("AI") in the retail environment and Everseen developed significant intellectual property related to that model.  Everseen's solution was the first of its kind and has gotten significant traction with customers across the world, helping to develop a brand-new market and opportunity that will be worth billions of dollars.  By partnering with Everseen, Walmart was able to observe, over a period of several years, Everseen's research and development as it discovered and created this technology, and Walmart thereby gained valuable insights about this new technology.

### 1.     Generation One:  G1

44.     By mid-2016, Everseen had developed a working system (the "G1" system) that helped prevent shrinkage from non-scan events.  The G1 system used feeds from video cameras ████████████████████████ in coordination with data from POS registers to identify circumstances in which a product should have been scanned (based on the feed from the video cameras) but no scan was recorded by the POS register.  These incidents are referred to as "non-scan events."

45.     The G1 system was installed at the retail stores on standalone computers with central processing units ("CPUs").  Because of the volume of the data being processed, the complexity of the programming associated with analyzing the images to predict whether non-scan events had occurred, and (for the SCO registers) the need for the system to work in real

time, the G1 system often stretched the capabilities of the computers on which it was running.

46.     Everseen developed a set of specifications for setting up the cameras that were part of its G1 system, and subsequent versions of its CPI technology.  These specifications optimized the system's ability to analyze the most important images without having to consume processing resources to crop out or ignore irrelevant views.  These specifications are not generally known and are not ascertainable by inspecting Everseen's as-installed system. Everseen derives value from the fact that these specifications are not generally known because they provide Everseen a competitive advantage over solutions that do not have such optimized camera settings.  Accordingly, Everseen takes reasonable steps to maintain the confidentiality of these specifications, including by limiting their disclosure only to customers or potential customers who are under obligations to maintain their confidentiality.

47.     The G1 system further identified and defined ███████████████████ ████████████████████████████████████████████████ ████████████████████████. Everseen developed the ███████████████ based on its years of experience and observation of shoppers and employees.  The ██████████ ████████████ are not publicly known and are not determinable by inspecting Everseen's as-installed system.  Everseen derives value from the fact that ██████ are not publicly known because they provide Everseen a competitive advantage over solutions that focus on a wider scope of activity and thus are less efficient and effective.  Accordingly, Everseen takes reasonable steps to maintain the confidentiality of ████████████████████████, including by limiting their disclosure only to customers or potential customers who are under obligations to maintain their confidentiality.

48.     Related to Everseen's ██████████████████████████, it also

determined, based on its years of experience and review and analysis of millions of scanning transactions, what type of activity and behaviors to be looking for.  Based on its experience and review of these transactions, Everseen determined specific actions and movements that had a high correlation to non-scan events (i.e. situations where an item was moved into the bagging area without being scanned by the POS register).

49.    The identification of these specific actions and movements which were implemented in Everseen's G1 system, and subsequent versions of its CPI technology, are not publicly known and would not be ascertainable by observing Everseen's as-installed system. Everseen derives value from the fact that the identification of these specific actions and movements are not publicly known because that gives it a competitive advantage over systems that do not focus on, or look for, these particular actions and movements.  Accordingly, Everseen takes reasonable steps to maintain the confidentiality of the identification of these specific actions and movements, including by only disclosing its attention to these specific actions and movements to customers or potential customers who are under obligations to maintain their confidentiality.

50.    The G1 system employed ████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████

51.    Everseen developed the algorithms and software code that powered and implemented the G1 system's ████████████████████ to identify scan events.  This code is Everseen's copyrighted work.  The algorithms and code are not publicly known and could not be ascertained by inspecting Everseen's as-installed G1 system.  Everseen derives value from the

fact that its algorithms and software code are not publicly available because they provide Everseen a competitive advantage over solutions with algorithms and software code that either focus on different events, or are less effective or efficient at identifying scan events. Accordingly, Everseen takes reasonable steps to maintain the confidentiality of the algorithms and software code powering its G1 system, including by limiting their disclosure only to customers or potential customers who are under obligations to maintain their confidentiality.

52.     Upon detecting a scan event, the G1 system, and subsequent versions of Everseen's CPI technology, ███████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████.

53.     ██████████████████████████████████████████████████ ████████████████████████████████████████. Within seconds of a non-scan event occurring, the Everseen system sends an alert to the POS register, ██████████ ████████████████████████████, and "freezes" the transaction by locking the POS register until a store employee confirms with the shopper whether the shopper wishes to purchase the item in question.  Everseen also offered a mobile app that would allow alerts to be sent to an employee handheld device, rather than displaying the alert on the checkout terminal.

54.     Designing a system that would be able to analyze, predict, and identify non-scan events in real time was a significant challenge.  To be able to provide these real-time alerts, the G1 system, and subsequent versions of Everseen's CPI technology, implemented various design, architecture, and coding features that Everseen developed to maximize its efficiency and minimize redundant code or system calls.  These features are not publicly known and would not

be ascertainable to someone observing Everseen's as-installed system.  Everseen derives value from the fact that these features are not publicly known because that provides Everseen a competitive advantage over solutions that are not able to provide such alerts in real time. Accordingly, Everseen has taken reasonable steps to maintain the confidentiality of these features, including by limiting their disclosure only to customers or potential customers who are under obligations to maintain their confidentiality.

55.     For manned POS registers, Everseen's G1 system, and subsequent versions of its CPI technology, synchronizes (from a timing perspective) the data from the POS registers with the video feed ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████.

56.     Everseen's ████████████████████████████████████ ████████████████ is not publicly known and would not be ascertainable to someone observing Everseen's as-installed system.  Everseen derives value from the fact that this solution is not publicly known because that provides Everseen a competitive advantage over systems that are unable to ████████████████████████████████████████ ████████████████.  Accordingly, Everseen has taken reasonable steps to maintain the confidentiality of this solution, including by limiting their disclosure only to customers or potential customers who are under obligations to maintain their confidentiality.

57.     Everseen also has developed confidential and proprietary methods for running and managing technology installed at thousands of stores.  Everseen developed systems, software, and processes to make its CPI technology scalable and effective at a chain-wide level.  These

developments are not publicly known and could not be ascertained by inspecting Everseen's as-installed G1 system.  Everseen derives value from the fact that these features are not publicly available because they provide Everseen a competitive advantage over solutions that are less scalable and thus less attractive to large retail companies.  Accordingly, Everseen takes reasonable steps to maintain the confidentiality of these features, including by limiting their disclosure only to customers or potential customers who are under obligations to maintain their confidentiality.

58.     The G1 system, and the various confidential and Everseen trade secret components and features incorporated in that system, were highly effective at identifying non-scan events and providing alerts (either in real time for SCO, or as part of day-end reports for manned lanes) that helped Everseen's customers significantly reduce the amount of loss experienced as a result of non-scans at the POS register.

## 2.     Generation Two: G2

59.     One constraint of the G1 system was that it had limited scalability because a dedicated CPU was required for the aisles on which the system was installed (with a single CPU needed for around 6 aisles).  Also, the G1 system used substantially all of the computing power of the CPUs on which it was installed, leaving no additional bandwidth for other programs or functionality.  During 2017, Everseen continued developing a second generation of its solution that solved these problems.  This new version was known as G2 (for Generation 2).

60.     One of the primary differences between the G1 and G2 systems is that the G2 system was installed on a server and leveraged the computing power of the server's graphics processing units ("GPUs").  Unlike the setup for G1, a single server would be set up for a store, which would then run the G2 system across all of the checkout lanes in that store.

61.     Because of the confidential and trade secret enhancements Everseen made to its

system architecture and coding, the G2 system was much more efficient than G1, and despite the fact that it was implementing a much more sophisticated approach to identifying non-scan events, it did not use all of the computing power of the GPU, allowing the servers on which it was installed to be used for other programs and functionality.

62.     The G2 system (and subsequent generations) also utilized, and in some cases improved upon, Everseen's confidential and trade secret camera positioning specifications, ████████████████████████████████████████████████, identification of behavior correlated to non-scan events, software and algorithms, system design, optimization that allowed for substantially real-time alerts for SCO checkout lanes, and its ██████████ ████████████████████████████████████████, described above, which Everseen updated and improved over time.

63.     One critical improvement of the G2 system over the G1 system was the adoption of deep learning, a form of AI which involves the creation, training, and deployment of deep neural networks to analyze the video feeds and thereby identify scanning actions of interest (whereas the G1 system relied on classical computer vision algorithms and empirical machine learning approaches for its analysis).

64.     Everseen designed, trained, and implemented the deep neural networks to identify scanning actions as part of its non-scan detection system used in the G2 system, and subsequent versions of Everseen's CPI technology.  The deep neural networks Everseen designed, trained, and implemented are not publicly known or available and are not ascertainable to someone observing Everseen's as-installed system.  Everseen derives value from the fact that its design, training, and implementation of its deep neural networks are not publicly known because they provide Everseen a competitive advantage over systems without AI or systems with inferior

neural networks.  Everseen has taken reasonable steps to maintain the confidentiality of its design, training, and implementation of its deep neural networks, including by limiting their disclosure only to customers or potential customers who are under obligations to maintain their confidentiality.

65.     Another improvement of the G2 system was the expansion of the set of customer behavior its deep neural networks were trained to analyze in identifying non-scan events. Everseen discovered that by focusing on certain customer movements that were highly correlated to an intent to move an item into the bagging area without scanning (or paying for) it, the system could more accurately identify non-scan events that, but for the system's alert and interference, would have resulted in shrinkage.

66.     Everseen's updated set of customer actions correlating to intent, and the design, training, and implementation of its deep neural networks to identify these actions, are not publicly known and would not be ascertainable by observing Everseen's as-installed system. Everseen derives value from the fact that these actions, and the design, training, and implementation of its deep neural networks to identify these actions, are not publicly known because that provides Everseen a competitive advantage over systems that are not optimized to identify such actions.  Accordingly, Everseen has taken reasonable steps to maintain this confidentiality including by limiting disclosure of information about these specific customer actions, and about its deep neural networks relating thereto, only to customers or potential customers who are obligated to maintain their confidentiality.

67.     Another major advance that Everseen introduced with its G2 system was adding a new capability to identify and address shrinking from two entirely different categories of customer behavior at SCO checkout areas:  product- and ticket-switching.

68.     "Product switching" occurs when a customer enters incorrect information about a product.  Product switching can occur when a customer uses the "scan by weight" option, and selects a product that is cheaper by weight (for example bananas) than the item actually being scanned (for example portabella mushrooms), or when a customer uses the "scan by weight" option (and selects a low-price item like bananas) for an item is not priced by weight (for example a bottle of wine).  "Ticket switching" occurs when a customer scans a low-price item (or its barcode) instead of a high-price item moved into the bagging area.  Ticket switching can be accomplished by holding the cheaper (often smaller) item under the expensive item in a way that blocks the expensive item's barcode, by removing the barcode sticker from an inexpensive item and sticking it over the barcode of the expensive item, or by scanning an inexpensive item multiple times but never scanning the expensive item.

69.     Everseen developed this new functionality by designing, training, and implementing deep neural networks to determine whether the image of a scanned item as observed by the video camera feed matched the item as scanned by the POS register.  Like with the non-scan deep neural networks described above, the deep neural networks Everseen designed, trained, and implemented for the product- and ticket-switching use cases are not publicly known and could not be ascertained by someone observing the as-installed Everseen system.  Everseen also derives value from the fact that these deep neural networks and their training are not publicly known through the competitive advantage it gains by their use, and it has taken reasonable steps to maintain their confidentiality, including by limiting their disclosure only to customers or potential customers who are under obligations to maintain their confidentiality.

70.     Based on its experience in retail shrinkage, and its understanding of how to best

leverage its system, Everseen also developed strategies for identifying products on which to focus the product- and ticket-switching functionality.  These strategies helped minimize shrinkage from product- and ticket-switching while minimizing processing cost to the system. These strategies are not generally known and are not ascertainable by inspecting Everseen's as-installed system.  Everseen derives value from the fact that these strategies are not generally known because they provide Everseen a competitive advantage over solutions that do not have such optimized camera settings.  Accordingly, Everseen takes reasonable steps to maintain the confidentiality of these strategies, including by limiting their disclosure only to customers or potential customers who are under obligations to maintain their confidentiality.

71.     After deploying its G2 system, Everseen continued to improve its precision.  It determined that a substantial portion of alerts occurred when the system identified non-scan events ███████████████████████████████████.

72.     To improve the system's performance, Everseen further refined ████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████.

73.     Everseen's identification of this additional behavior, ████████████████████ ██████████████████████████, and the design, training, and implementation of its deep neural networks to incorporate this discovery, are not publicly known and would not be ascertainable by observing Everseen's as-installed system.  Everseen derives value from the fact that these developments are not public because that gives Everseen a competitive advantage over

systems without such refinements in place.  Accordingly, Everseen takes reasonable measures to maintain the confidentiality of its discovery of certain behavior correlating to non-scan events, ███████████████████████████████████████████████████, and its design, training, and implementation of its deep neural networks to incorporate these discoveries, including by disclosing this information only to customers or potential customers who are under an obligation to maintain their confidentiality.

###    3.    Generation Three:  G3

74.    In late 2018, Everseen began working on its G3 Solution.  Everseen showed Walmart the early workings of this system in early 2019 and showed Walmart some of the features and functionality it added.  The two primary improvements over G2 were (1) expanding the list of customer actions and product tracking examined by the deep neural networks to indicate a non-scan event and (2) redesigning the deep neural networks used for the product- and ticket-switch use cases to make that solution more effective and scalable.  █████████████ ████████████████████████████████████

75.    By mid-2020, Everseen had determined this broader list of intent-correlated customer movements and had trained its deep neural networks to search for them.  Some of these actions required ███████████████████████████████████████████████████ ████████████████████████████████████████████████.

76.    Everseen's updated set of customer actions correlating to intent, and the design, training, and implementation of its deep neural networks to identify these actions, are not publicly known and would not be ascertainable by observing Everseen's as-installed system. Everseen derives value from the fact that these actions, and the design, training, and implementation of its deep neural networks to identify these actions, are not publicly known because that provides Everseen a competitive advantage over systems that are not optimized to

identify such actions.  Accordingly, Everseen has taken reasonable steps to maintain this confidentiality including by limiting disclosure of information about these specific customer actions, and about its deep neural networks relating thereto, only to customers or potential customers who are obligated to maintain their confidentiality.

77.     Everseen also improved its product- and-ticket-switching use cases by improving the deep neural network's ability to predict whether the product seen by the camera matches the product scanned by the POS register.  Starting with the G3 system, Everseen optimized its approach to identifying product- and ticket-switching events in a way that required fewer dedicated deep neural networks to be designed, trained, and implemented than the previous version.  This innovative approach also allowed Everseen to scale the product- and ticket-switching use cases without compromising accuracy (which was not a feature of the G2 system's implementation of these use cases).

78.     Everseen's innovative optimization of the product- and ticket-switching use cases, and the deep neural networks it designed, trained, and implemented, are not publicly known and would not be ascertainable by observing Everseen's as-installed system.  Everseen derives value from the fact that this solution, including the resulting deep neural networks, is not publicly known because that gives Everseen a competitive advantage over systems that use traditional product identification neural networks and are thus not as generally applicable or scalable. Accordingly, Everseen has taken reasonable steps to maintain this confidentiality including by limiting disclosure of information about this solution, including the deep neural networks, only to customers or potential customers who are obligated to maintain their confidentiality.

79.     In addition to the confidential information and trade secrets described above, Everseen's trade secrets included the myriad discoveries Everseen made and the process

improvements it made during the years it was developing and implementing the G1, G2, and G3 systems.  Such discoveries and improvements include identification of behavior that led to shrinkage in the retail setting, developing and implementing efficient methods to prevent or correct that behavior, and deploying its deep technical prowess to leverage AI to automate those processes and make them scalable.  Everseen also identified ways in which its technology could be implemented by retailers beyond the checkout area, including for example to help control loss in and optimize a retailer's warehouse and supply chain processes.  These ideas and solutions, which were the result of years of effort and analyses by Everseen, are not generally known and are not determinable by inspecting Everseen's as-installed technology.  Everseen derives value from the fact that these discoveries and solutions are not publicly known because they provide Everseen a competitive advantage over its competitors who have not made these discoveries or implemented these solutions.  Accordingly, Everseen takes reasonable steps to maintain the confidentiality of these discoveries and solutions, including by limiting their disclosure to only customers or potential customers who are under obligations to maintain their confidentiality.

### 4.    Everseen's Efforts to Maintain Confidentiality

80.    Everseen's proprietary technology is the core of its business and it takes the security and confidentiality of that technology very seriously.  Everseen has implemented many safeguards to ensure that its confidential information, technology, and trade secrets remain confidential, including (but not limited to): ██████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████

81.     Everseen's data security and management system has been certified as compliant with the ISO/IEC 270001 standards.  This is a third-party certification that a company's information security management systems and processes meet strict criteria and conform to internationally recognized best practices.

82.     Collectively, the technologies described in the preceding paragraphs are Everseen's confidential information and trade secrets.  The details of these technologies were provided to Walmart ██████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████ .

**B.     The Parties' Relationship and Contracts**

83.     In 2014, Everseen reached out to Walmart about its CPI technology.  Evidently recognizing the substantial potential value, Walmart responded immediately, ████████████████ ████████████████████████████████████████████████ .

84.     From the outset, confidentiality was critical to Everseen because its cutting-edge technology was its lifeblood.  ██████████████████████████████ ████████████████████████████████████ ██████████████████████████████████ ███████████████████████████████████████ ██████████████████████████████████ ████████████████████████████████ ██████████████████████████████ ███████████████████████████████████ ██████████████████████████████████

24



85.

86.

87.

1.

88. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████

89. ███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

██████████████████

90. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

91. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████

92. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

**2.** ██████████████████████████████

93. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████

94. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████



95.

96. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████
██████████████████████████████

97. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████

98. ████████████████████████████████████
████████████████████████████████████
████ ████ ██████████████████████████████
████████████████████████████████
████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████
████████████

3.   ████████████████████

99. ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████





100.

101.

### 4.    Provision of Confidential Information and Trade Secrets

102.    Over the course of the Parties' business relationship, Everseen provided software, data, source code, and documentation to Walmart that contained its non-public, confidential information, copyrights, and trade secrets, including those described above.  As an example, Everseen provided Walmart with Everseen's software, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.  As another example, Everseen provided Walmart with documentation including diagrams and explanations of how its system worked.  Everseen also provided information and data to Walmart, including about the confidential information and trade secrets described above, on a regular basis in its

communications (in person, telephonic, by email, and via PowerPoint presentation) with

Walmart. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████

**C.      Walmart's Misappropriation**

103.    ████████████████████████████████████████████

██████████████████████████████████. Walmart recognized

the value of the system but began to chafe at being dependent on Everseen for that technology.

While Everseen did not know it at the time, Walmart was looking for ways to decrease its

dependency on Everseen, ███████████████████████████████████

███████████████ and ultimately developing its own system (based on Everseen's technology)

to address the losses from shrinkage.

104.    ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████

105.    By late 2018, Walmart had implemented Everseen's technology in approximately

██████ stores, and Everseen had successfully demonstrated the newest version of its solution, G2,

████████████████████████████████. The Walmart groups responsible for

developing technology and preventing loss realized they had a growing problem:  Everseen was

becoming an indispensable part of Walmart's loss prevention technology solution. ██████████

████████████████████████████████████, and none of Everseen's competitors

offered solutions with Everseen's non-scan functionality.

31

106.  

107.

108.    At the same time, however, Walmart continued its efforts to develop an alternative to Everseen, this time by reviving its efforts to develop its own technology.  Having gained detailed insight into Everseen's CPI technology, and having access to the underlying software, data, and documentation, Walmart set out to develop its "own" solution based on Everseen's technology.  Given the ample information about Everseen's technology at its fingertips ████████████████████████████████████████████, Walmart rapidly developed the Walmart Derivative Solution, and in an unrealistically short period of time had a fully functioning, store-ready system.  For context, it took Everseen, a leader in the field, over six years to develop and refine such a store-ready system.

109. ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████

110.    The competitive harm Everseen now faces in the form of the Walmart Derivative

Technology ████████████████████████████████ is a direct result of years of Walmart's

████████████████████████████████████████ failure to respect Everseen's intellectual property

rights.

       **1.**     **From late 2017 through mid 2019, Walmart** ████████████████████████████████████████████

111.    In September 2017, Mike Hanrahan ("Hanrahan"), CEO of Walmart IRL Labs

visited Everseen headquarters in Cork, Ireland on behalf of Walmart.  He informed O'Herlihy

that he wanted to evaluate Everseen's technology █████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ O'Herlihy, in reliance on this

representation, shared sensitive technical details of the non-scan solution.

112.  ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

113.  Beginning in August 2018, the relationship began to change.  ████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████  Specifically, Matthew Grover ("Grover"), a technical specialist for

Walmart Labs, showed up on the scene.  ████████████████████████

████████████████████████████████████

████████████████████████████.  At the time that

Grover sought this information, Everseen was in contract review with Walmart.  Everseen

understood that Grover had significant influence over whether Walmart would decide to continue

its relationship with Everseen.  Everseen felt that if it did not provide Grover with the

information he requested, it could lose Walmart as a customer.

114.  ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████

115. ██████████████████████████████████
████████████████████████████████████
████████████████████████████████████
███████████████████████████

116. ██████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

117. ██████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████████████████████

118. ██████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████████████████████
████████████████████████████████████
███████████████████████████████████
████████████████████████████████████
████████████████████████████████████

119. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

120.     Believing Grover had significant control over the outcome of the contract review, as described above, ██████████████████████████████████████████ ██████████████████████████, Everseen provided Walmart with the information Grover requested to demonstrate the truly innovative nature of its technology.

121. ████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

122.    Following the March meetings, Everseen wrote Walmart to make clear that the

information Walmart was requesting was confidential, constituted Everseen's trade secrets and,

as with the information previously provided, ███████████████████████████████

███████████████

123.    ████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████████

124.    Everseen then provided the documents requested by Walmart.  The documents

stated that they were "confidential" and provided the critical details one would need to replicate

the Everseen solutions for addressing both non-scan and product switching.

    **2.**    ████████████████████████████████████████████



125.

126.

127.

███████████████████████████████████████████

████████████████████████

128.   ████████████████████████████

█████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████

129.   ██████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████████

130.   ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

131. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

███████

132. ████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████

133. ████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

██████████████████████

134. ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

### 3. Walmart copies the Everseen system

135. █████████████████████████████████████████

███████████████████ Walmart decided to take matters into its own hands and develop an

alternative solution itself, albeit one based on Everseen's technology.  It had already received the

information it needed to do this from Everseen █████████████ .  ██████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

136.   Once Walmart ████████████████████████ , it redoubled its efforts to

develop its own technology.  It began using Everseen's data, software, trade secrets, and

confidential information to quickly develop and implement a solution that took Everseen years to

develop legitimately.  ███████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████. Coupled with

the extensive and detailed confidential information Everseen had provided Walmart about its

technology, Walmart had all the ingredients it needed to make unprecedentedly fast progress in

developing its technology.

137. ████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████

███████████████████

138. ██████████████████████████████████

██████████████████████████████████

██████████████████████████████████████

139. ████████████████████████████

███████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████

140. ████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████

141. █████████████████████████████████

█████████████████████████████████████

142. █████████████████████████████████



143.

144.

███████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████

███████

**D.    Walmart Violates Everseen's Copyrights**

145.    Everseen's technical schematics and computer source code (the "Works") are also protected by copyright.  The Works are original works of authorship that are protected by United States copyright law.  Everseen has the distinct, severable, and exclusive rights to, among other things, reproduce the copyrighted works, display the copyrighted works publicly, publicly distribute copies of the copyrighted works, and prepare derivative works of the copyrighted works.

146.    Everseen's Works are unpublished.  One or more of the authors of each Work are not nationals, domiciliaries, or habitual residents of the United States. The Works therefore do not need to be registered under United States law prior to commencement of litigation.

147.    On information and belief, Walmart copied the Works when it copied Everseen's technical schematics and when ███████████████████████████████, as described above.

**E.    █████████**

148.    ███████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████



150.    Everseen has learned, however, that Walmart has begun installing its own Walmart Derivative Technology in its stores; a system it had been entirely unable to get off the ground prior to obtaining the confidential details of Everseen's CPI technology—a system that functions in the same manner as Everseen's system and, as described above, is based on the misuse of Everseen's confidential information and trade secrets.

151.    Everseen has also learned that Walmart is marketing the Walmart Derivative Technology, which is based on Everseen's system, to other companies throughout the world.

**F.    Everseen Has Been and Will Be Damaged by Walmart's Unlawful Conduct**

152.    Walmart's actions have already harmed Everseen, and if not remedied, will continue to harm Everseen in an irreparable manner.

153.    Walmart's decision to misappropriate Everseen's technology, ████████. But those ████ pale in comparison to the damage Walmart's misuse and misappropriation of Everseen's confidential information and trade secrets has caused, and will continue to cause, by permitting Walmart to compete with Everseen using Everseen's

own technology.

154.    Walmart's misappropriation of Everseen's confidential information and trade secrets will also cause Everseen irreparable harm.  Until recently, Everseen was growing at a fast pace, and its groundbreaking technology positioned it to dominate an emerging market representing an opportunity worth billions of dollars.

155.    Now, however, Everseen faces competition in the form of its own technology, misappropriated and re-branded by the world's largest retailer, Walmart.  This competition is real and has already begun.  The risks to Everseen are two-fold:  it might lose out on customer contracts it would have otherwise won; and in cases where Everseen is awarded a customer contract, the competition from Walmart will have likely driven the contract price, and thus Everseen's profits, down.

156.    

157.    Everseen's losses are not limited to the contracts it will lose as a result of competition from Walmart ████████, enabled by Walmart's misappropriation of Everseen's confidential information and trade secrets, and the lower prices Everseen will receive on the contracts it does win because of this competition.  Everseen's non-CPI technology business and

supply chain solutions will also suffer.  When Everseen deploys its CPI technology with a customer, it presents the opportunity to expand its product offerings using Everseen's technology.  Walmart recognized this as it was █████████████████████████████. Thus, by improperly stunting the growth of Everseen's CPI technology business, Walmart's misappropriation also will cost Everseen significant revenues from its other business lines.

158.    The timing of Walmart's misappropriation, and the extent to which that misappropriation has allowed Walmart ██████ to compete with Everseen now, amplifies the long-term harm to Everseen.  The relevant market is now only emerging, in large part due to Everseen's developments and creation of the market in the first place.  By taking Everseen's technology, Walmart has introduced its Walmart Derivative Technology ████████ ██████████████████ at a critical time, threatening Everseen's rightful place as the unquestioned market leader.  The result could be that instead of dominating a market that has year-over-year revenue potentials in the billions of dollars, Everseen could be forced to split that market with the world's largest retailer, who is only able to compete because it copied Everseen's technology.

159.    Everseen thought it had found in Walmart a good partner, for whom it could provide state-of-the-art AI technology to address the serious problem of shrinkage.  It is now clear Walmart was not a good business partner to Everseen.  Instead, Walmart engaged in a systematic and prolonged pattern of ████████████████████████████ misappropriating Everseen's trade secrets.  Having used Everseen's technology to develop its own alternative, ██████████████████████████████ ████████████████, while using Everseen's own technology to compete against it for

business with other retailers.  If Walmart is permitted to continue 
using Everseen's intellectual property it misappropriated, the resulting damage to Everseen's
business will be irreversible.  Everseen thus files this action to stop further damage, and to seek
compensation for the damage Walmart has already done.

**COUNT I:**

**Breach of Contract**

160.    Everseen incorporates by reference paragraphs 1-159 of this Complaint as though
fully set forth herein.

161.    ███████████████████████████████████████
████████████████████████.

162.    Everseen has performed fully under the parties' agreements, or its performance
has been excused by Walmart's material breaches as alleged herein.

163.    ███████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████
█████████████████████████████████████
█████████████████████████████████████
█████████████████████████████████████
█████████████████████████████████████
███████████████████

164.    As a result of the foregoing, Everseen has suffered damages in the form of ██████
█████████████████████████████████████

, money spent forensically investigating Walmart's misappropriation of its confidential information and trade secrets and mitigating the impact of that misappropriation, lost revenues in the form of lost sales and lower prices resulting from competition it faced as a result of Walmart's unlawful behavior, and potential future damages of potential loss of business due to ███████████████████████.

165.    ████████████████████████████████████████████████████████████████████████████████████████████████████████

166.    ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

**COUNT II:**

**Misappropriation of Trade Secrets in Violation of the Arkansas Trade Secrets Act**

167.    Everseen incorporates by reference paragraphs 1-166 of this Complaint as though fully set forth herein.

168.    Everseen markets, distributes, and sells its CPI technology across the United States, including at Walmart locations across the United States.

169.    Everseen is the sole owner of the trade secrets that comprise the method, process, procedure, and technique for providing its CPI technology.

170.    Everseen took reasonable steps to maintain the secrecy of its trade secrets.

171.    The trade secrets had independent economic value from not being generally known to other persons or businesses and could not be ascertained through proper means.

172.    To the extent Walmart reverse engineered Everseen's CPI technology, it did so by misappropriating Everseen's trade secrets.

173.    

174.

175.

176.

177.

178.    Walmart knew that Everseen considered the method, process, procedure, and technique for implementing its CPI technology to be trade secrets.

179.

180.    Walmart also utilized the trade secrets to implement its own solution at Walmart stores using its Walmart Labs research group, including offering and providing that solution to third parties ██████████████ .

181.    Everseen never consented to the trade secrets being disclosed to Walmart employees not working to implement the Everseen technology, or to Walmart using the trade secrets to engineer a competing solution to Everseen's CPI technology.

182.    

183.    ███████████████████████
███████████████████

184.    Walmart misappropriated Everseen's trade secrets by using ████████ Everseen's trade secrets ████████████████████ .

185.    Walmart also misappropriated Everseen's trade secrets by its acquisition, use, and disclosure of the trade secrets through improper means.

186.    ████████████████████████
██████████████████████
██████████████████████
████████████████████████
███████████████

187.    Walmart's conduct was both willful and malicious.

188.    As a result of Walmart's misappropriation of Everseen's trade secrets, Everseen has suffered and continues to suffer significant damages in an amount to be proven at trial,

including in the form of lost profits from lost sales and price erosion resulting from the presence or acceleration of competition resulting from Walmart's misappropriation.

189.    As a result of Walmart's misappropriation of Everseen's trade secrets, Walmart has profited in a significant amount to be proven at trial.

190.    Walmart's actions describe above have caused and will continue to cause irreparable damage to Everseen, for which it has no remedy at law.  Unless the Court restrains Walmart from continuing its misappropriation and use of Everseen's trade secrets, these injuries will continue to occur in the future.  Pursuant to A.C.A. § 4-75-604, Everseen is accordingly entitled to injunctive relief restraining Walmart from further infringement.

191.    Everseen is entitled to their costs, including reasonable attorneys' fees, pursuant to A.C.A. § 4-75-607.

## COUNT III:

## Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act

## (18 U.S.C. § 1836, et seq.)

192.    Everseen incorporates by reference paragraphs 1-191 of this Complaint as though fully set forth herein.

193.    Everseen markets, distributes, and sells its CPI technology across the United States, including at Walmart locations across the United States.

194.    Everseen is the sole owner of the trade secrets that comprise the method, process, procedure, and technique for providing the CPI technology.

195.    Everseen took reasonable steps to maintain the secrecy of its trade secrets.

196.    The trade secrets had independent economic value from not being generally known to other persons or businesses and could not be ascertained through proper means.

197.    To the extent Walmart reverse engineered Everseen's CPI technology, it did so by misappropriating Everseen's trade secrets.

198.    ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████

199.    ██████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████

200.    ████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████

201.    ███████████████████████████████████████████

███████████████████

202.    ███████████████████████████████████████████

███████████████████████████████████████████████

████████████████

203.    Walmart knew that Everseen considered the method, process, procedure, and technique for implementing its CPI technology to be trade secrets.

204.    ███████████████████████████████████████████

███████

205.    Walmart also utilized the trade secrets to implement its own solution at Walmart stores using its Walmart Labs research group, including offering and providing that solution to third parties ██████████████████.

206.   Everseen never consented to the trade secrets being disclosed to Walmart employees not working to implement the Everseen technology, or to Walmart using the trade secrets to engineer a competing solution to Everseen's CPI technology.

207.   ██████████████████████████████████████
██████████████████████████████████████████
████████████████████████████

208.   ██████████████████████████████████████
█████████████████████████

209.   Walmart misappropriated Everseen's trade secrets by using ████████ Everseen's trade secrets ██████████████████████████████.

210.   Walmart also misappropriated Everseen's trade secrets by its acquisition, use, and disclosure of the trade secrets through improper means.

211.   ██████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
█████████████████████████

212.   Walmart's conduct was both willful and malicious.

213.   As a result of Walmart's misappropriation of Everseen's trade secrets, Everseen has suffered and continues to suffer significant damages in an amount to be proven at trial, including in the form of lost profits from lost sales and price erosion resulting from the presence or acceleration of competition resulting from Walmart's misappropriation.

214.   As a result of Walmart's misappropriation of Everseen's trade secrets, Walmart

54

has profited in a significant amount to be proven at trial.

215.    Walmart's actions described above have caused and will continue to cause irreparable damage to Everseen, for which it has no remedy at law.  Unless the Court restrains Walmart from continuing its misappropriation and use of Everseen's trade secrets, these injuries will continue to occur in the future.  Pursuant to 18 U.S.C. § 1836(b)(3)(A), Everseen is accordingly entitled to injunctive relief restraining Walmart from further infringement.

216.    Everseen is entitled to their costs, including reasonable attorneys' fees, pursuant to 18 U.S.C. § 1836(b)(3)(D).

## COUNT IV:

### Direct Copyright Infringement

217.    Everseen incorporates by reference the allegations set forth above in paragraphs 1-216.

218.    Everseen owns copyright in its technical schematics and source code (the "Works").

219.    The Works are not United States works because they are unpublished works and one or more of the authors of each Work are not nationals, domiciliaries, or habitual residents of the United States.

220.    Walmart, without permission or consent of Everseen, has made unauthorized reproductions of Everseen's copyrighted works, including, but not limited to, Everseen's technical schematics and, on information and belief, source code.  Walmart's conduct constitutes direct infringement of the exclusive rights of Everseen under the Copyright Act in violation of 17 U.S.C. § 501.

221.    Walmart's actions described above have caused and will continue to cause

irreparable damage to Everseen, for which it has no remedy at law.  Unless the Court restrains Walmart from continuing its infringement of Everseen's copyrights in the Works, these injuries will continue to occur in the future.  Pursuant to 17 U.S.C. § 502, Everseen is accordingly entitled to injunctive relief restraining Walmart from further infringement.

222.    As a direct and proximate result of Walmart's infringement, Everseen has suffered actual damages.  Everseen is entitled to recover those actual damages, and any profits of Walmart that are attributable to the infringement and are not taken into account in computing the actual damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that the Court:

1.    Declare that Walmart has committed willful trade secret misappropriation and copyright infringement;

2.    Assign ownership to Everseen of all derivative works created by Walmart based on Everseen's Licensed Technology, including Walmart's purported homegrown solution, the Walmart Derivative Technology, to the shrinkage-prevention problem;

3.    Enjoin Walmart and its officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with each or any of them, from directly or indirectly reproducing, distributing, displaying, or otherwise infringing or causing, enabling, facilitating, encouraging, or inducing the reproduction, distribution, display, or other infringement of, any of the respective copyrights owned or exclusively controlled, in whole or in part, by Everseen;

4.    Enjoin Walmart and its officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with each or any of them, from utilizing or

56

disclosing Everseen's trade secrets or confidential information, including by installing, implementing, using, selling, or offering to sell its checkout technology that incorporates Everseen's trade secrets or confidential information;

5.     Order Walmart to deliver up for destruction, including deletion from Walmart's computer servers and other devices, all unauthorized copies of the works for which Everseen owns or exclusively controls the copyrights, in whole or in part;

6.     Order Walmart to deliver up for destruction, including deletion off Walmart's computer servers and other devices, all unauthorized copies of Everseen's trade secrets;

7.     Award Everseen compensatory damages for actual loss caused by Walmart's breach of the contract to the fullest extent permitted by law;

8.     Award Everseen compensatory damages for actual loss caused by Walmart's misappropriation of Everseen's trade secrets to the fullest extent permitted by law;

9.     Disgorge Walmart's profits accrued as a result of the misappropriation of Everseen's trade secrets and award them to Everseen;

10.     Award Everseen actual damages pursuant to 17 U.S.C. § 504(b), and Walmart's profits from infringement that are not taken into account in computing the actual damages, as will be proven at trial;

11.     Award Everseen exemplary damages for the loss caused by Walmart's misappropriation of Everseen's trade secrets to the fullest extent permitted by law;

12.     Award Everseen costs in this action, including the reasonable attorneys' fees of Everseen pursuant to A.C.A. § 4-75-607, 18 U.S.C. § 1836(b)(3)(D), and 17 U.S.C. § 505;

13.     Award Everseen pre-judgment and post-judgment interest at the applicable rate on any monetary award made as part of the judgment against Everseen; and

14.     Provide such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Everseen hereby demands a trial by jury of all issues that are so triable.

Dated:  February 16, 2021                                  Respectfully Submitted,

*/s/ Geoff Culbertson*
Geoffrey Culbertson (2014011)
Kelly B. Tidwell (88061)
Patton, Tidwell & Culbertson, L.L.P.
2800 Texas Boulevard
Texarkana, Texas 75503
Phone: 903-792-7080
Fax: 903-792-8233
gpc@texarkanalaw.com
kbt@texarkanalaw.com

Daralyn J. Durie (pending *Pro Hac Vice*)
Ragesh K. Tangri (pending *Pro Hac Vice*)
Eric C. Wiener (pending *Pro Hac Vice*)
Aaron J. Benmark (pending *Pro Hac Vice*)
217 Leidesdorff Street
San Francisco, CA  94111
Telephone:     415-362-6666
Facsimile:      415-236-630
ddurie@durietangri.com
rtangri@durietangri.com
ewiener@durietangri.com
abenmark@durietangri.com

Andrew Esbenshade (pending *Pro Hac Vice*)
DURIE TANGRI LLP
953 East 3rd Street
Los Angeles, CA 90013
Telephone:     213-992-4499
Facsimile:      415-236-6300
aesbenshade@durietangri.com

ATTORNEYS FOR PLAINTIFF

**EXHIBITS 1–12 ARE REDACTED IN FULL AND THEREFORE NOT
ATTACHED TO THIS FILING**